**AETNA LIFE INSURANCE COM-PANY, Appellant,**

v.

**TEXAS GULF SULPHUR COMPANY,**
Appellee.

No. 15776.

United States Court of Appeals
Fifth Circuit.

Aug. 3, 1956.

Rehearing Denied Oct. 8, 1956.

Hutcheson, Chief Judge, dissented in part.

W. N. Arnold, Jr., Houston, Tex., W. Braxton Dew, Hartford, Conn., Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., for appellant.

Thos. M. Phillips, Houston, Tex., Baker, Botts, Andrews & Shepherd, Houston, Tex., F. G. Coates, James L. Read, Houston, Tex., of counsel, for appellee.

Before HUTCHESON, Chief Judge, and CAMERON and BROWN, Circuit Judges.

PER CURIAM.

As the opinion of Chief Judge Hutcheson so colorfully portrays the case, accurately delineates the issues, expounds the competing contentions and, by contrasting the large area of our mutual agreement with the limited scope of our differences, effectively emphasizes the point of departure, we think it best to indicate briefly our disagreement in result and reasoning and thus preserve the continuity of that opinion.

We are all in agreement that the Freeport decision was correct. [Freeport Sulphur Co. v. Aetna Life Ins. Co., 206 F.2d 5, 41 A.L.R.2d 762]. With unhesitating fidelity to that result and Freeport's reasoning, we each seek diligently to discover and apply its teachings. We are also all in agreement that in its interpretation, the nature of the judicial system based on written opinions as the means of giving life to law and guidance to its craftsmen, requires that we, as would any other Judges, read it for what it says and then *say* what it says, Mississippi Valley Barge Line Co. v. Indian Towing Co., Inc., 5 Cir., 232 F.2d 750, 1956 A.M.C. 757, with none having, with none claiming, in that process, advantage or disadvantage from participation in that former appeal or the opinion.

We are likewise in agreement that, though responsibility must be laid at our feet for having led him into it, the District Judge gave too much, indeed almost conclusive, weight to the much discussed words [1] of the opinion. We are, finally,

---

1. Judge Strum wrote:
   "In reserving the right to modify the premium rates on this policy, however, Aetna specifically provided for increases in rates through March 31, 1954, indicating that Aetna itself contemplated that the contract would remain in effect at least until that date." [206 F.2d 5, 7.]

in agreement that, reiterating here Freeport's determination that the parties contemplated a *long-time* contract of extended duration—a holding which completely undercuts Aetna's main prop, the argument of non-mutuality and the incongruity of giving Texas Gulf but not it, an unlimited escape—what we attempted to do, what we intended to do, there was to declare in terms of law, the time *beyond* which the parties could not reasonably have meant to go—a time we fixed there at March 31, 1954, for a total term of 20 years.

It is here that our paths diverge. For agreeing once more that a 20-year term has no magic legal significance and that this conclusion of law must find its source in the setting of the Freeport contract, Judge Hutcheson concludes, as we cannot, that the contracts are identical and hence, results must be identical. In that process he also disregards altogether the much mooted sentence and actually abandons the stated rationale of Freeport—reasonable time—for an entirely new concept advanced to this day nowhere in prior opinions or briefs, that the continuing option was binding only for the—" ' "year period *entered* upon thereafter." ' "

But the contracts are different—significantly different in the very area of specified contract periods, and admittedly because of the difference in the underlying bargains. In Freeport rates as to annuities, original and increased, could *never* be raised as to employees coming under the plan in the first five years (1934 to 1939). Recognized soon as an onerous agreement, Aetna a few months later was unwilling to extend that vital privilege to Texas Gulf and sought[2] (in the intense sales campaign it waged to *persuade* Texas Gulf to give it this business) by extending the periods from five to ten years, to make up for it. It is, we believe, unreasonable for us, as Judges, to think that when two huge business concerns negotiate on high levels between articulate, skilled executives over a contract of immense importance to both, that this difference was either trivial or, as Aetna puts it, "adventitious." And, accepting Judge Hutcheson's rationale of an option limited to the contract period then "entered upon", the contract, expressly making Texas Gulf's for ten, rather than Freeport's five-year period, subjected Aetna to *double* that obligation.

So, while we do not think, on the one hand, that the words (note 1, supra) are conclusive, we are, on the other hand, equally unwilling either to disrate them in Aetna's words, brief page 25 as " * * * evidently thrown in for good measure and without much thought * * * demonstrably conceived in error * * * included through inadvertence * * * [and thus] * * * entitled to little weight * * * ", or effectually disregard them altogether because, in Judge Hutcheson's language, these "* * * specific dates are of no more significance in the determination of the overall reasonable time for its ending than those periods introduced by 'et cetera.' " We think here, as in Freeport, they were of significance and so intended by the Court. The very spirited attack (see note 8 Judge Hutcheson's opinion) so soon made on them by Freeport's Petition for Rehearing brought these very arguments to the Court's attention while it was still fresh and new. Of course, it would be unrealistic to say that opinions must be amended or modified to meet every supposed deficiency pointed out in Petitions for Rehearing, but we who now

---

2. Aetna's brief [page 22], after pointing out the difference between Freeport and Texas Gulf contract, states: "By August 1, 1934, when the Texas Gulf contract became effective, Aetna was no longer willing to exempt the employees entering the plan during the first 5 years from increases. But perhaps with a will to make up to Texas Gulf in a measure for the denial of this valuable exemption no longer available to anyone, Aetna agreed not to increase premiums on any employees for 10 years from inception (instead of 5 as in Freeport) and not to make subsequent increases except to the extent of 5% of the original premiums every 10 years (instead of 2½% every 5 years as in Freeport). * * * "

follow can hardly assume, in this posture, that this was mere make-weight.

■ As we have pointed out, there is a critical difference both in date and reasons as between the Freeport and Texas Gulf contracts. It, we think, both highlights the difference in specified times and, correlatively, the similarity of purpose. So that, once again, we are all in agreement that the "key" is largely to be found in this contractual provision. In Freeport those coming under the plan during the first period (1934 to 1939) could not be affected by subsequent increases and their rights were beyond alteration of any kind. Obviously then, the escalation could apply only to those coming in during the three subsequent periods (1) 1939 to 1944, (2) 1944 to 1949, (3) 1949 to 1954. It was this time that the Court in Freeport considered, as a matter of law, to be within the range of reasonableness. Applying the same formula of three comparable periods subject to escalation in the Texas Gulf contract, the periods will be (1) 1934 to 1944, (2) 1944 to 1954, (3) 1954 to 1964, with the terminal date then fixed at August 1, 1964. Since there is no "exempt" period and, unlike the Freeport contract, Texas Gulf annuitants coming under the plan during the "first" period (1934 to 1944) are subject to the subsequent escalation increases, we thus adhere uniformly to the principles established in Freeport and yet take adequate account of the differences.

The decree of the District Court appealed from in this cause will therefore be modified so as to designate August 1, 1964, as the date upon which Aetna has the right to discontinue the contract as to new coverages, and, as so modified, said decree will be affirmed.

Modified and affirmed.

HUTCHESON, Chief Judge (concurring in part and dissenting in part).

This appeal from a summary judgment presents for review what, with minor and unimportant variations, is a twice told tale of two group annuity contracts entered into on April 1, 1934, and August 1, 1934, between Aetna Life Insurance Company, as insurer, and Freeport Sulphur Company, on the one hand, and Texas Gulf Sulphur Company, on the other, as employer. It is concerned with the contentions, counter-contentions, and litigations arising out of the fact that in neither of the contracts was a time of termination stated, and thereby hangs the tale.

The first contract gave rise to the litigation in the District Court of the United States for the Eastern District of Louisiana, which was dealt with and disposed of, in the District Court, in Freeport Sulphur Co. v. Aetna Life Ins. Co., 107 F.Supp. 508, 510, and, in this court on appeal, in Freeport Sulphur Co. v. Aetna Life Ins. Co., and reverse title, 206 F.2d 5, 41 A.L.R.2d 762.

As the tale unfolded in the first suit, with Freeport in its self-assigned role of Little Red Riding Hood, and Aetna in that assigned to it by Freeport of the wicked wolf, Freeport's claim was that the contract was in perpetuity and was without termination, while that of Aetna was that the contract neither states nor implies any term for the duration and is subject to a good faith termination by Aetna at any time.

The district judge, to whom the controversy was submitted on motion for summary judgment filed by Aetna and Freeport, rejecting both of these views as extreme and unwarranted, held that the contract was one for a reasonable time, and that the evidence fixed this at twenty-five years, and April 1, 1959 as the day upon which Aetna might discontinue writing new coverages at the rates provided in the several steps. Dissatisfied with the judgment, both Freeport and Aetna appealed, and this court, agreeing with the district judge throughout except as to what was a reasonable time for termination of the contract, held, one judge dissenting, that the evidence fixed this not at twenty-five but at twenty years. The decree was accordingly modified so as to designate April 1, 1954, as the day upon which Aetna might discontinue the writing of new coverages, and, as modified, the decree was affirmed.

It is the second of these contracts, with respect to which contentions and controversies had arisen before and had been going on during the pendency of the Freeport suit, which has given this litigation rise. Filed by plaintiff, Texas Gulf Sulphur Company, in the Southern District of Texas, on January 20, 1953, when the Freeport suit had finally come to an end, the complaint alleged: that an actual controversy had arisen between plaintiff and defendant as a result of a notice given by Aetna, that it had the right to refuse coverage to persons becoming employees after July 31, 1950, and that it was entitled to charge rates for the coverage of such employees in excess of the rates set forth in the schedule of guarantees in said group annuity contract. Alleging that, as to such persons, defendant can make no increases in its rates other or greater than as set forth in said schedule, plaintiff sought a declaratory judgment, that Aetna continued to be obligated at the rates provided in the contract to insure all such persons employed after July 31, 1950, and an injunction.

By amended complaint, plaintiff alleged that, after the filing of the suit, plaintiff had received from defendant a supplemental notice,[1] dated January 26, 1954, fixing August 1, 1954, when the contract will have been in force twenty years, as the cut-off date, and further stating in effect that after December 23, 1959, it would not be bound under the group annuity contract to sell any further annuities.

Aetna first moved under Section 1404 (a) to transfer the cause to the Southern District of New York for the convenience of the parties and in the interest of justice. This motion denied, Aetna answered defending its right to issue the notices complained of and to take action in accordance therewith.

Thereafter, alleging that the contract on its face evidenced an intention by defendant that it was to continue at least to the year 1984, and attaching documents, affidavits, depositions, and letters, plaintiff filed a motion for summary judgment, declaring invalid the notices issued by Aetna, purporting to terminate the contract, and ordering specific performance of it until the year 1984.

Defendant Aetna, on its part, basing its motion upon the pleadings, affidavits, and exhibits in the case, moved for a summary judgment, declaring: the notice of June 30, 1950, issued by it, valid; that the contract was as matter of law terminable as of August 1, 1951, the date named in the first notice; and that, in the alternative, the first paragraph of the notice of January 26, 1954, note 1, supra, was valid and effective, and the contract was terminable as of August 1, 1954, and judgment should so declare.

Finally, and as an additional, separate, and independent ground, defendant alleged that the second paragraph of the notice of January 26, 1954, note 1 supra, is valid and effective and entitles defendant to refuse after December 23, 1959, when the present existing charter of

1. "(1) We hereby respectfully notify you that we stand in all respects on the notice directed to you on or about June 30, 1950, Exhibit 2, to your complaint in Texas Gulf Sulphur Co. v. Aetna Life Ins. Co. [141 F.Supp. 84], now pending in the United States District Court at Houston. However, we hereby further notify you that if said former notice should for any reason be held premature or otherwise defective, the privileges and benefits of your Group Annuity Contract No. GA–114 will in no event be extended to any employees not becoming eligible for coverage, under the terms of the said contract, prior to August 1, 1954, when the contract will have been in force twenty years.

"(2) We notify you further, as a new and independent proposition, that after Dec. 23, 1959, when your initial charter expires, no further annuities or items of annuity will be sold or issued under the said Group Annuity Contract No. GA–114 to, for, or on behalf of any person whomsoever, whenever employed, and whether or not now purchasing annuities or items of annuity under the contract.

"(3) We are giving you this supplemental and additional notice in order that its validity may be determined in the suit now pending if either party so desires."

plaintiff expires, to write any further annuity or items of annuities.

On these motions, supported by a voluminous record made up of documents, affidavits, and depositions, there was a full hearing and argument, and the district judge, holding that the case was ruled by our opinion in the similar case of Aetna Life Ins. Co. v. Freeport Sulphur Co., decided by this court, 206 F.2d 5, 41 A.L.R.2d 762, determined that a reasonable time under the contract in suit was forty years. He entered his decree accordingly. Aetna has appealed.

In the course of his carefully prepared opinion in the cause,[2] referring to the Freeport litigation and correctly declaring, "The contract here is substantially the same as the Freeport contract, the facts in this case and in that case are quite similar, and most of the questions raised here are settled by the opinions in that case", he held, as the Freeport case had held, that the contract, though not a perpetual, was a continuing, one, not terminable by Aetna at its will or void for want of mutuality, and that, "'since no term for the option is provided in the contract, it is terminable after a reasonable time.'"

Declaring: "This Court is, therefore, called upon as the Courts were called upon in the Freeport case to determine what is a reasonable time", and noting that the district judge in the Freeport case had held twenty-five years a reasonable time, while this court holding this to be excessive had declared twenty years reasonable, the district judge thus carefully set out the dominant clauses.[3] These, placed in each contract in accordance with "the guarantees to the employer of premium rates", while guaranteeing the continuance, during each successive period "entered upon", of the rate fixed for that period, reserved to Aetna the right to determine as to each new period whether it would be entered upon.

---

2. 141 F.Supp. 84, 85.

3. Saying: "The modifying clause in the Freeport contract referred to by both Courts is as follows:

"'* * * provided that at no time between April 1, 1939, and Mar. 31, 1944 shall premium rates be established which are more than 7½% greater than the original rates, at no time between April 1, 1944, and Mar. 31, 1949, shall premium rates be established which are more than 10% greater than the original rates, at no time between April 1, 1949, and Mar. 31, 1954 shall premium rates be established which are more than 12½% greater than the original rates, et cetera, the maximum permissible difference between the new rates and the original rates *increasing by 2½% of the original rates for each five year period entered upon thereafter.*' [Emphasis supplied.]

"A similar clause in the contract here is as follows:

"'The Company reserves the right, upon three months' written notice to the employer, to modify any one or more of the following at any time after this contract has been in force ten years:

* * * * *

"'(c) The premium rates in Tables A, B, and/or C provided, however, that at no time between Aug. 1, 1944, and Aug. 1, 1954, shall premium rates be established which are more than 5% greater than the original rates, at no time between Aug. 1, 1954 and Aug. 1, 1964 shall premium rates be established which are more than 10% greater than the original rates, at no time between Aug. 1, 1964, and Aug. 1, 1974, shall premium rates be established which are more than 15% greater than the original rates, et cetera, the maximum permissible difference between the new rates and the original rates *increasing by 5% for each ten year period entered upon thereafter.*' [Emphasis supplied.]"

the court concluded: "Using the same process of reasoning here as there, it seems clear that Aetna itself contemplated that the contract here would remain in effect at least until Aug. 1, 1974, or a period of forty years from its date."

Rejecting plaintiff's contention that the parties contemplated that the contract should remain in force until 1984, or for fifty years, the district judge also rejected defendant's contention that, if the Freeport decision was adhered to, a reasonable time would be twenty years, and its independent contention that after 1959, the date when the original charter of Gulf would have expired, defendant could cease altogether writing new contracts.

Reasoning by analogy from the statement in our opinion in the Freeport case in effect that the mention of the year 1954 in the premium change clause as the last year mentioned by name indicated that Aetna contemplated that the contract would remain in effect at least until that date, the district judge declared that the mention of the year 1974 in the change of rate clause in the contract before him as the last date mentioned by name gave like significance to that date. So declaring he took the year 1974, or forty years after its signing, as the reasonable time during which the contract should and would continue in effect and entered judgment accordingly.

Appealing from that judgment, Aetna, attacking the rulings and judgment of the district judge, is here presenting five questions for decision,[4] and urging as to each that the answer should be in the affirmative.

Addressing myself to each of these in turn, I think it sufficient to say of the claim of error implied in question one that, in my opinion, it is without substance. To appellant's claim that only New York judges are competent to determine what is New York law, and that, since the contract was a New York contract, the case should have been sent to New York for trial, a claim which on its face seems most provincial, appellee opposes the admitted facts, that plaintiff is a Texas corporation with its principal office and place of business and the great majority of its employees in the Southern District of Texas, and the further fact that the same questions here pre-

---

4. These are:

I. Whether this case should not have been transferred to the United States District Court for the Southern District of New York under Section 1404(a) of the Judicial Code, 28 U.S.C.A. § 1404(a).

II. Whether, if the Freeport case stands, under its authority Aetna should not be relieved from writing annuities for all employees except such as became eligible for coverage prior to August 1, 1954, the twentieth anniversary of the contract.

In this connection Aetna states: "The District Court correctly considered itself bound by the decision of this Court in Freeport Sulphur Co. v. Aetna Life Ins. Co. (7-24-53) 206 F.2d 5, 41 A.L.R.2d 762, but it misconstrued that decision and erred in not holding that a reasonable time for the termination of the contract as to new employees was 20 years from inception, as was held in the Freeport case."

III. Whether Aetna is not entitled to a trial on the fact question, or the mixed question of fact and law, as to what is a reasonable time, so as to make it improper to have entered a summary judgment against Aetna in any event.

IV. Whether, upon a reconsideration of this whole problem, this court should not now overrule the reasoning of the Freeport case and hold (a) that the contract, lacking any fixed or ascertainable term, is terminable at will in its executory features after such time elapses as to show good faith at inception, and that such time (17 years) had elapsed as a matter of law at maturity of Aetna's first notice of termination dated 6–30–50; (b) that the contract lacks consideration or mutuality, and has become unfairly discriminatory contrary to applicable statutes of both New York and Texas, and that it is therefore terminable insofar as it remains executory, and was so terminable at the time defendant served its first notice of June 30, 1950; and (c) that if the so-called "reasonable time rule" applies in determining when new employees may be excluded, that time had expired long before any notices of termination were served or matured in this case.

V. Whether the District Court did not err in refusing to hold that Aetna was entitled to cease writing new annuities on all employees, both old and new, as of Dec. 23, 1959, at which time there was expiration of the charter of Texas Gulf which was in existence and non-renewable at the time the Group Annuity contract was executed.

sented for decision have already been decided in this circuit.

Of the claim presented in plaintiff's question four, that this court should in this case reconsider and overrule the decision in the Freeport case, it need only be said that we regard that case as having been correctly decided and are content with the decision.

Of the error implicit in question five, it is sufficient, I think, to say that for the reasons hereafter briefly stated and more fully developed in the brief of appellee, the contention that, because Texas Gulf's charter as it existed in 1934 would have expired in 1959, unless amended, it should be held that the contract expired in that year, is completely unmeritorious.

There is no evidence showing or tending to show that Aetna knew of the expiration date of Gulf's charter, therefore none that the fact that it was for a limited time entered at all into the consideration of the parties in negotiating for and in entering into the contract. There is certainly no more of merit in Aetna's contention that the original time limit of Gulf's charter fixed or determined the time of the termination of the contract than there was for Freeport's insistence in its case, an insistence which the trial court and this court rejected out of hand, that because its charter was a perpetual one, it must be held that its contract was in perpetuity.

It is settled law that a corporation is not limited to contracting obligations which must be completed before the expiration of the corporate life, and in 13 American Jurisprudence, "Corporation", "Power to Contract", Sec. 810, p. 823, it is said: "The mere fact that a corporate contract may extend beyond the term of the life of the corporation does not destroy it." [5] Besides the Legislature in 1937, by the adoption of Art. 1315(a), R.C.S., Vernon's Ann.Civ.St.Tex., pro-

vided a method for the extension of charters, and, pursuant thereto, Texas Gulf's corporate life was, on Dec. 15, 1951, extended to Dec. 23, 2009, giving it an additional fifty years.

When it comes, however, to question two and the error it presents, that, though holding that the Freeport decision was controlling in this case, the district judge, by designating August 1, 1974, a date twenty years later than the date fixed in that decision, as the date after which Aetna could discontinue writing new coverages at the stipulated premium rates, had failed to give it proper application, it seems clear that appellant is right and that the judgment should be modified.

I am of this view, not only because the evidence, in my opinion, affords no rational basis for any substantial distinction between this case and Freeport's case, but because the evidence in this case, as it did in Freeport's case, compels the conclusion that under the undisputed facts in both cases, Aetna could not as matter of law be compelled to write new coverages under the rate limitations of its contract after its twentieth anniversary, April 1, 1954, in Freeport's case, August 1, 1954, in Gulf's.

This clearly and plainly results, I think, from the provision of the contract giving Aetna the right during successive periods to make limited increases in the premium rates, and from the fact that the key to Aetna's obligation under the contract in each case is to be found in that clause of the guarantees to the employer, providing that the original pension premium rates may not be increased by more than a specified percent in any period, five years in Freeport's, and ten years in Gulf's, contract, "entered upon" after the first five years in Freeport's, and the first ten in Gulf's contract.

5. Cases to the same effect are City of Detroit v. Detroit Citizens' St. Ry. Co., 184 U.S. 368, 22 S.Ct. 410, 46 L.Ed. 592; City of Minneapolis v. Minneapolis Street Railway Co., 215 U.S. 417, 30 S.Ct. 118, 54 L.Ed. 259; People v. O'Brien, 111 N. Y. 1, 18 N.E. 692, 2 L.R.A. 255; New York Central & H. R. R. Co., v. City of New York, 202 N.Y. 212, 95 N.E. 638; Miner v. New York Central & H. R. R. Co., 123 N.Y. 242, 25 N.E. 339.

The naming of the specific dates, note 3 supra, in each contract was without controlling influence on the overall time the contracts might be continued. The stated dates for the first three periods in each case, as well as the unstated ones, provided for by the "et cetera" provision, were merely hypothetical periods based upon the expectation, not that Aetna must, but that Aetna might,[6] still be issuing new coverages under the contract as each respective period opened, and they operated not to compel it to enter upon such periods but to oblige it if it entered upon each particular period to continue without change during that period the rate fixed for it.

The twenty year difference in the projection of stated dates came about in a very simple way. In the Freeport contract, effective April 1, 1934, it was provided that the rates for employees who came into the contract during the first five years could never be raised, but for all other employees the rates could be increased 7½ percent of the original rate in April 1, 1939, increasing by 2½ percent of the original rate every five years thereafter. The 1939 increase would apply only to new employees because those employees who had already entered the plan were exempt, but the 1944 and subsequent five year increases would apply to the future premiums of all employees who had come into the plan since 1939 or should come into it after that date.

By August 1, 1934, when the Texas Gulf contract became effective, Aetna was no longer willing to exempt from increases the employees entering the plan during the first five years. But perhaps with a will to make up to Texas Gulf in a measure for the denial of this valuable exemption no longer available to anyone, Aetna, as is shown in note 3, supra, agreed to an escalation scale fixing the successive periods which might be entered upon at ten years and the percentages of the successive escalations in each period "entered upon" at five instead of 2½ percent.

Aware, as we were, of the focus of attention on the provisions in the proposal for guarantees and in the contract itself, that the dominant consideration for entering into the contract was the fixing of these guarantees [7] so that Aetna could

---

6. Cf. what is said in Coffin v. Landis, 46 Pa. 426, at pages 432–433.

7. Counsel for appellee in his brief on pages 55 to 58 take note of the great significance and importance of the premium guarantees, and thus points them up:

"To refer again to the formal proposal submitted in May 1934, the following guarantee is found also under the heading, 'The Guarantees To The Employer', and sub-heading, 'Guarantee of Premium Rates': 'Pension premium rates are guaranteed against increase for 10 years from the date of the contract. The basic pension premium rates may not be increased by more than 5% for *each 10 year period entered upon after the first ten years.*'

"*The importance of this premium guarantee must not be underestimated.* In the group annuity contracts issued today, Aetna Life Insurance Company reserves the right, after a specified time, to make any increases desired in premiums, chargeable to old and new employees alike, thus providing the insurance company with an effective escape clause. In the group annuity contracts issued prior to April, 1934, a provision was usually inserted reserving the right to make any desired change in the premium rate of new employees entering the plan after a stated number of years following its execution. This type of provision was also an effective means of escape since it permitted the insurance company to so increase the premiums on new employees that the employer would be forced to cancel the contract.

\* \* \* \* \*

"*There can be no doubt that these definite premium guarantees played a decisive role in the success of Aetna in selling the contract to Texas Gulf.* \* \*

\* \* \* \* \*

"*In the final drafting of the contract as executed, the parties were careful to see that the aforementioned premium guarantees were carried forward and made a part of the contract.* If these premium guarantees, which were considered by both parties to be the decisive reason for placing the contract with Aetna, together with the other statements

not step the rates up at its will and pleasure, this court, in its opinion in the Freeport case and in explanation of our refusal to approve the district judge's findings of fact in a summary judgment case and our determination as matter of law that Aetna would have the right at the end of the third of the rate increase periods, expiring on March 31, 1954, to cease writing new coverages on that date, declared [206 F.2d 7]:

"We differ with the district judge only as to what is a 'reasonable time' for the operation of the contract. We think 25 years is too long. Since April 1, 1934, economic conditions have radically changed, interest rates have sharply declined, and life

expectancy has substantially lengthened. All these things enter into the rates to be charged for such a policy as this.

"In reserving the right to modify the premium rates on this policy, however, Aetna specifically provided for increases in rates through March 31, 1954, indicating that Aetna itself contemplated that the contract would remain in effect at least until that date." [8]

It is this latter paragraph in the opinion, and this paragraph alone, which is responsible for the fact that the cause was decided below on the basis of a period of forty years rather than, as was decided in Freeport's case, that twenty

---

found in these preliminary negotiations, are to have any meaning, the contract must be continued at least through 1974." (Emphasis supplied.)

8. In its petition for rehearing, Freeport, realizing the apparent inconsistency in pointing as a limitation upon the contract to the stated date, March 31, 1954, and seeking to turn it to the account of the claim it had already labored in vain with the district judge, that the stated time dates had no significance in fixing the total time the contract was to run, put the matter thus:

"The majority opinion is inconsistent with itself because, while recognizing the significance of the enumeration of time periods in the rate limitation clause in the policy, the opinion ignores the fact that the enumeration is followed by the highly important words 'et cetera'. Without any reason the majority opinion denies any effect to these words and thus deletes them from the policy or makes them meaningless.

"In the majority opinion the court states:

"'In reserving the right to modify the premium rates on this policy, however, Aetna *specifically* provided for increases in rates through Mar. 31, 1954, indicating that Aetna itself contemplated that the contract would remain in effect at least until that date.'

"It is true that the rate limitation clause specifically referred to a series of five-year periods ending March 31, 1954, but it is no less true that this reference was followed by the words 'et cetera'. If the inclusion of the date 'March 31, 1954' signified that the contract would remain in effect at

least until that date, as the Court has held, the use of the words 'et cetera' must necessarily have signified that Aetna contemplated that the contract would remain in effect beyond that date. We have contended that the use of those words contemplated several five year periods after 1954, the last date mentioned, but it can hardly be denied that they necessarily require at least one such period—otherwise 'et certera' is given no meaning at all. Would anybody reading the contract in 1934, and seeing the term 'et cetera' have supposed that Aetna could stop covering new entrants in 1954?

"Lord Coke observed a long while ago that 'an et cetera doth imply some other necessary matter'. See Bagley v. Rose Hill Sugar Co., 111 La. 249, 35 So. 539, 548 (1903) where the Court in considering the effect of the words 'et cetera' ('etc.') quoted with approval the Century Dictionary to the effect that these words are used when more instances of the same sort might have been mentioned but are omitted for brevity. Beers, Aetna's Vice President who negotiated the contract for Aetna, in his deposition in effect conceded that the purpose of the use of the words 'et cetera' was to eliminate the necessity of continuing to recited further specific periods ending, e. g., Mar. 31, 1959, March 31, 1964, March 31, 1969, et cetera.

"By the same reasoning, therefore, by which the Court properly concluded that Aetna's obligation to cover new entrants must continue until Mar. 31, 1954, the court cannot avoid the conclusion that the obligation must continue at least five years beyond that time. Otherwise the court reads the words 'et cetera' out of the contract."

800

years was the limit and, though it was certainly not written with the specific intent that it should form the controlling basis for the decision, it is as certainly true: that, both in what was said and in what was left unsaid, it was and is misleading, and that the fault for the district judge's decision in this case cannot be ascribed to him.

On the contrary, it must be laid at the door of our opinion in apparently pointing, as a guide to the decision of the question, to the last date specifically mentioned in the premium guarantees rather than, as should have been done, to the significance of the date as the ending of one of the series of five year periods beginning in 1939, and then pointing out more clearly than we did that, having actually entered upon the third period, Aetna could not, as matter of law, complain of being required to continue writing new coverages until its end.

Applying the same rule to Gulf's contract, which provided for ten instead of five year periods and began the periods in 1934, I think it must be held in this case that, having given notice within the second period, that it did not intend to enter upon another ten year period, though Aetna could not complain of being required to continue writing new coverages until the end of that period, it could cease to do so at its end.

The district judge, in the Freeport case, where the argument was vigorously pressed upon him by Freeport that, by provisions for indefinite succession of these five year steps, the parties had indicated an intention that the contract would continue over the long period of time which the "et cetera" clause provided for, carefully pointed out that, by the very indefiniteness of continuation of these periods, the parties had made it plain that the provision for successive periods was not intended to, it did not furnish a guide to the determination of the overall time the contract would last.

While I agree with the district judge in the Freeport case, and with Freeport's counsel in its motion for rehearing, that the periods marked off by specific dates are of no more significance in the determination of the overall reasonable time for its ending that those periods introduced by "et cetera", I am convinced that in the provisions for the successive periods is to be found the key to the decision of Freeport's case and of this one. This key is that in Freeport's case each five year period entered upon after 1939, and in Gulf's each ten year period entered upon after the making of the contract, represents, it is, the reasonable time for the continuation of the contract during which Aetna may be compelled to continue writing new coverages at the specified rates. This is to say that in contracting with Gulf Aetna intended to, and did, bind itself that as each successive period was entered upon it would be bound for that period not to change the rates and, per contra, that while Aetna, after entering upon the period between 1944 and 1954, would not, by giving notice of its intention to cease writing new coverage at specified rates, have the right to depart from these rates before the period was over, it would be allowed to do so at its end.

Holding, then, as matter of law, that Aetna was bound by its entry in 1944 upon the ten year period from 1944 to 1954, to continue to write new coverage during that period at the rates fixed for it, but that, having before entering upon the next ten year period beginning August 1, 1954, announced its intention to cease writing at the rates fixed for that period, it was entitled to do so at its end.

I concur in the decision of the majority that the judgment should not be affirmed as written but should be modified. Of the opinion, however, that it should be modified to designate August 1, 1954, as the date upon which Aetna had the right to discontinue the contract as to new coverages at the rates fixed for successive periods, I dissent from the opinion of the majority designating August 1, 1964 as the cut off date.